# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **SELENA BUTLER,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | **Case No.: 05-CV-0784-VEH** |
| **v.** | } | |
| | } | |
| **NATIONAL HEALTHCARE** | } | |
| **CORPORATION,** | } | |
| | } | |
| **Defendant.** | } | |

## OPINION

This Court has before it the February 6, 2006 motion of Defendant National

Healthcare Corporation ("Defendant") for summary judgment as to Plaintiff Selena

Butler's gender discrimination claim (Doc. 18).   For the reasons set forth below, the

Defendant's motion for summary judgment is due to be granted in part and denied in

part as to Plaintiff's gender discrimination claim based on disparate treatment in

disciplinary rules, discriminatory discharge, and retaliation under Title VII of the

Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e et seq.

## I.  Procedural History

Plaintiff Selena Butler commenced this action on April 13, 2005, by filing

a complaint in this Court alleging that her former employer violated her rights under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., specifically the Pregnancy Discrimination Act, by terminating her employment because of her expressed intent to become pregnant.

On February 6, 2006, the Defendant filed a motion for summary judgment asserting: (1) that Plaintiff Butler has no direct evidence of pregnancy discrimination; (2) that Plaintiff Butler cannot establish a prima facie case of pregnancy-related sex discrimination because she cannot identify a similarly-situated employee outside the protected class who was treated more favorably than her; and (3) that even if Plaintiff Butler could establish a prima facie case, Plaintiff Butler has failed to rebut the Defendant's legitimate, non-discriminatory, and non-retaliatory reasons for its employment actions and demonstrate that the Defendant's alleged reasons are pretextual.

The Defendant has submitted evidence[1] in support of its motion for summary judgment and filed a supporting brief on February 6, 2006. On February

---

[1] The Defendant submitted the depositions of Plaintiff Butler with attached exhibits, Sharon Forsyth with attached exhibits, and Patty Vera. The Defendant submitted declarations of Kim Waddell, Linda Weir, Craig Jones, Carla Dingler, and Kim Helms. The Defendant also submitted its handbook.

20, 2006, the Plaintiff filed a brief and evidence[2] in opposition to the Defendant's

motion for summary judgment.

## II.  Standard of Review

## A.  Summary Judgment

Under Federal Rule of Civil Procedure 56 (c), summary judgment is proper

"if the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any

material fact and that the moving party is entitled to judgment as a matter of law."

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transport, 229

F.3d 1012, 1023 (11th Cir. 2000).  The party asking for summary judgment always

bears the initial responsibility of informing the court of the basis for its motion and

identifying those portions of the pleadings or filings which it believes demonstrate

the absence of a genuine issue of material fact.  Celotex Corp., 477 U.S. at 323.

Once the moving party has met his burden, Rule 56(e) requires the nonmoving

party to go beyond the pleadings and by his own affidavits, or by the depositions,

answers to interrogatories, and admissions of file, designate specific facts showing

that there is a genuine issue for trial.  Id. at 324.

---

[2] The Plaintiff submitted the declarations of Selena Butler, Jamie Bolton, Judy Cross, and
Kim Helms.

The substantive law will identify which facts are material and which are irrelevant.  Chapman, 229 F.3d at 1023; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  Chapman, 229 F.3d at 1023; Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248; Chapman, 229 F.3d at 1023.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  Anderson, 477 U.S. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial.  See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of Real Property, 941 F.2d 1428 (11th Cir. 1991)(en banc)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial.  Fitzpatrick, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

4

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.  The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to <u>affirmatively</u> show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case. Fitzpatrick, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding,

the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  Lewis v. Casey, 518 U.S. 343, 358 (1996) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

### III.  Relevant Facts[3]

Defendant NHC HealthCare Corporation owns and operates NHC Place, a specialty care and assisted living facility in Anniston, Alabama (hereinafter "NHC").  (Complaint, ¶ 5; Answer,  ¶ 5).  On April 10, 2004, NHC hired Plaintiff to work full-time on day shift, 12 hour shifts, with every other weekend off, as a Licensed Practical Nurse ("LPN") Supervisor.  (Pl. Depo. p. 52).  Among other duties, LPN Supervisors are responsible for administering resident care and supervising resident attendants. (Pl. Depo. pp. 53-56; Exh. 8 to Pl. Depo.).  Plaintiff supervised four to five attendants on two shifts.  (Pl. Depo. pp. 134-135).

During her employment, NHC provided Plaintiff with NHC's Partner[4] Handbook.  (Pl. Depo. p. 57; Exh. 10 to Pl. Depo.; Partner Handbook[5]).  The

---

[3] Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the facts are presented in the light most favorable to the Plaintiff.  Facts are undisputed unless otherwise expressly noted. See Fitzpatrick, 2 F.3d at 1115.

[4] NHC refers to all of its employees as "partners." (See Pl. Depo. p. 99).

[5] The Partner Handbook was produced in discovery as Bates stamp numbers 0139 to 0180 and was verified by Plaintiff to appear to be the same as that given to her during her employment. (Pl. Depo. p. 57).

handbook provides the following in bold type:

> Please remember that this handbook is not a contract of employment, that your employment with NHC at all times is at-will, and that either you or NHC can terminate the employment relationship at any time, with or without notice.

(Partner Handbook, p. 9).  The handbook provides the following examples of conduct that may result in discipline, including dismissal from employment: "Insubordination;" "Harassment of patients, visitors and/or fellow partners and the causing of a hostile work environment, or having knowledge of such and not reporting it to the employer;" and "Disruptive activity, conduct or behavior on the premises." (Partner Handbook, pp. 62-63; see also pp. 68-69).

In addition, Plaintiff received a Harassment and Hostile Work Environment Policy.  (Pl. Depo. pp. 56-57; Exh. 9 to Pl. Depo.).  The Harassment and Hostile Work Environment Policy prohibits  conduct "which has the purpose or effect of adversely affecting a partner's performance, or which creates a hostile or offensive work environment." (Exh. 9 to Pl. Depo.).

Initially, Plaintiff reported directly to Kim Helms's, who worked as Nurse Manager at NHC.  (Pl. Depo. p. 65).  Nurse Manager is the highest level nurse at NHC. (Pl. Depo. p. 80).   When Kim Helms went out on twelve weeks' maternity leave, Plaintiff began performing some of Helms' responsibilities, and continued

performing those responsibilities even when Helms returned from maternity leave. (Pl. Depo. pp. 54-56; Declaration of Kim Helms).

While Helms was on leave, Plaintiff was promoted to the Unit Coordinator. (Pl. Depo. p. 60). Plaintiff served as Unit Coordinator until the time she left NHC. (Pl. Depo. P. 69.) During the time Plaintiff was Unit Coordinator and directly reporting to Helms, there were changes in her job duties, including the administrator taking over the scheduling, having the RN perform the monthly assessments, and removing Plaintiff's authority to hire and fire attendants. (Pl. Depo. pp. 84-85).

Helms voluntarily resigned from her position with NHC shortly after returning from maternity leave. (Pl. Depo. pp. 80-81.) Sharon Forsyth became employed at NHC August 26, 2004, and replaced Helms as a Nurse Manager. (Forsyth Depo. pp. 9-10).

On May 27, 2004, Plaintiff voluntarily chose to change her status from "full time" to "NOBE" so that her rate of pay would increase 10 percent to $16.93/hour. (Pl. Depo. pp. 61-64, 67; Exh. 11 to Pl. Depo.). As a NOBE, Plaintiff was not entitled to any benefits, including paid-time off, paid sick-days, insurance, vacation, and paid holidays. (Pl. Depo. pp. 62-63). However, Plaintiff would have been entitled to twelve weeks unpaid maternity leave had she remained employed

with NHC upon the birth of her child.  (Butler Declaration, ¶5, Ex. 1 to Plaintiff's Evidence).

On Plaintiff's performance evaluation presented to her in May 2004 by Kim Helms, on a scale of 1 to 10 (10 being the highest score) Plaintiff received "0" for the category "Partner is Courteous and Friendly" and "Partner Demonstrates Pride in Performance" by one respondent in the customer section of the evaluation.[6]  A private sitter for a resident named Ms. Staples gave Plaintiff Butler the negative grades.[7]  (Butler Depo. pp. 101-102.).  However, the sitter gave Plaintiff Butler an 8 in the category of "Provides High Quality of Service."  Id.  Further, Ms. Staples gave Plaintiff Butler numerous Partner Excellence Performance[8] ("PEP") cards, thanking her for good performance. (Butler Depo. 103-104; Ex. 12 to Butler Depo.).  Moreover, the two other respondents in the customer section gave Plaintiff Butler a 9 and a 7 for the category "Partner is Courteous and Friendly" and an 8 and an 8 for the category "Partner Demonstrates Pride in Performance."  Helms,

---

[6] The evaluation form had a segment for three "customer interviews/comments," which was followed by the evaluating supervisor's segment of the evaluation.  (Butler's Depo. Ex. 14.).

[7] The sitter wrote additional comments that Plaintiff Butler is extremely rude, knows her job but she cannot deal with people in overall job performance.  There was a comment that the sitter for Ms. Staples would not have Plaintiff Butler as an employee.

[8] A PEP card is given to an employee by a co-employee, a resident or family member of a resident to signify a job well done or to show appreciation to the employee for going  "the extra mile." (Butler Depo. 91; Forsyth Depo. 120; Ex. 3 to Forsyth Depo.).

9

Plaintiff's evaluating supervisor at the time, gave Plaintiff Butler a mark of 8 in both "Customer Relation Skills" and "Partner Relation Skills," as well as a 10 in "Quality of Job Performance.[9]" (Ex. 14 to Butler Depo.)

Plaintiff claims that on Tuesday, October 26, 2004, while changing out an oxygen tank in a resident's room, Sharon Forsyth made the comment, "This is why you all need to quit smoking." (Pl. Depo. pp. 73-76). Plaintiff states she then said, "Well, I'm planning on quitting smoking because I'm planning on becoming pregnant."[10] Plaintiff claims Forsyth then stated, "Well, you better not plan on taking any maternity leave."[11] (Id.) Plaintiff said nothing further in response. (Id.) At no time did Plaintiff ever complain to anyone about Forsyth's alleged comment to her in response to Plaintiff's wanting to become pregnant. (Pl. Depo. p. 137-138). Prior to October 26, 2004, Plaintiff had no reason to believe that anyone at NHC had any problem with her or any other female getting pregnant.[12] (Pl. Depo.

---

[9] Under Customer Relations Skills, an area of improvement was noted: "Continue to work on communication skills, input, and non-verbal communciation." (Pl. Depo. pp. 99-100 and Exh. 14 to Pl. Depo.). Under Partner Relation Skills, an area of improvement was noted: "Work on voice tone and non-verbal communication." (Pl. Depo. Pp. 99-100 and Exh. 14 to Pl. Depo.).

[10] The Defendant alleges that if Plaintiff said anything about becoming pregnant, Forsyth did not hear that conversation. (Forsyth Depo. p. 170-172).

[11] Forsyth denies making this statement (Forsyth Depo. p. 175).

[12] Plaintiff first learned she was pregnant the first week of November 2004. (Pl. Depo. Pp. 82-83).

p. 77).  Plaintiff testified that Serena Elston was present at the time she made the statement that she wanted to get pregnant. (Pl. Depo. 74-76; 113-14).  Although the Defendant has records that Elston did not work on October 26, 2004, Plaintiff Butler recalls Elston being present. (Declaration of Craig Jones & Exh. A to Jones Declaration; Butler Depo. p. 113; Butler Declaration, ¶8).  Further, Plaintiff Butler was familiar with the software program used at NHC Place to record employees' attendance.  (Butler Declaration, ¶8)  She alleges that attendance information can be changed after the fact.  (Id.)

The Defendant asserts that in addition to customer complaints regarding Plaintiff Butler, the Defendant received complaints about Plaintiff Butler from other partners. Although the specific form and content of the complaints are disputed, the Defendant asserts that Patty Vera,  Judy Cross, and Jamie Bolton complained about their work relations with Plaintiff Butler and that they were going to quit because they could not work with her.[13] (Forsyth Depo. pp. 142-43, 165-66 and Exh. 4 to Forsyth Depo.; Vera  Depo. pp. 8-9; ).  The complaints of the other partners were used in the Defendant's decision to terminate the Plaintiff. Plaintiff Butler disputes the Defendant's claims that other partners, including Cross and Bolton, wanted to quit their jobs because they could not work with her.  Cross

---

[13] The Defendant also asserts that Helms wanted to quit because of Plaintiff Butler.

told Forsyth that she was having several different problems working at NHC Place, including Plaintiff Butler often being short and grouchy with her, and that things needed to change or she would have to quit.  (Cross Declaration, ¶4).  However, Cross had issues other than Plaintiff Butler, and she did not tell Forsyth that she would have to quit because of Butler.[14]  (Id).  Bolton testified that she did not call Forsyth, but that, a day or so before Butler was terminated, Forsyth came to her and told her that "corporate" had received complaints about Plaintiff Butler and that she was investigating them.  (Bolton Declaration, ¶3).  Forsyth asked Bolton questions about Butler.  (Id.)  Bolton told Forsyth that Butler was a tough supervisor but that she had to be that way to get her job done.  (Id.)  She also told Forsyth that Plaintiff Butler was the only supervisor who would pitch in and help the Certified Nursing Assistants and the residents.  (Id.)  Bolton never told Forsyth, or anyone else, that she wanted to quit because of Butler, that Butler was hostile or abusive, or that Butler made her feel like a slave.  (Bolton Declaration, ¶4).

Plaintiff filed her EEOC charge on November 3, 2004.  On April 13, 2005, plaintiff filed the Complaint that is the basis of this lawsuit.  Plaintiff's only claim

---

[14] Further, a week or so after the incident, Plaintiff Butler came to Cross and apologized for treating her that way.  (Cross Declaration ¶5).  After that, Butler treated Cross fine and she had no complaints about Plaintiff Butler.  (Id.).  Cross told Forsyth that Plaintiff Butler had apologized and was treating her fine.  (Id)

is that she believes that after she told Sharon Forsyth that she planned on becoming pregnant, she was terminated. (Pl. Depo. pp. 71-72). Plaintiff claims that Forsyth terminated her because she had stated that she was planning on becoming pregnant. (Pl. Depo. pp. 71-72). Plaintiff identifies Stacey Cossey as a comparator. (Complaint, ¶¶ 19-21). Forsyth had Plaintiff Butler act as a witness in a reprimand given to Cossey three days prior to Plaintiff Butler's termination.[15] (Butler Depo. pp. 132-134; Forsyth Depo. pp. 184-185; Ex. 4 to Forsyth Depo. p. 7). In this meeting, Forsyth told Cossey that she was creating a hostile work environment, that the other nursing assistants were complaining about her, that none of them wanted to work with her, and that Cross threatened to quit because of Cossey. (Id.) Stacey Cossey was a Nursing Assistant. (Pl. Depo. p. 131). Cossey did not supervise anyone. (Pl. Depo. p. 132). Plaintiff was Cossey's immediate supervisor.[16] (Pl. Depo. p. 135). Plaintiff is not aware of any employee complaining to Forsyth about Cossey's treatment of them. (Pl. Depo. p. 136).

Plaintiff applied at Autumn Cove in July or August of 2003 for a unit coordinator position, Monday through Friday, first shift, but was offered another

---

[15] Stacey Cossey had not expressed to Forsyth that she planned to become pregnant. (Complaint and Answer ¶20). As of that date, if Cossey was pregnant, Forsyth was unaware. (Id.)

[16]

position on another shift; therefore, she declined to accept.  (Pl. Depo. pp. 49-50).

In August or September 2004, Plaintiff applied for an LPN job with Allergy &

Asthma Center in Anniston, Alabama,  because she "had always wanted to work

in a doctor's office." (Pl. Depo. pp. 44-47).  Plaintiff was hired by Allergy &

Asthma Center "within days" after leaving NHC.  (Pl. Depo., pp. 44-45).

Plaintiff Butler  was  replaced  with  Iris  Murphy.   (NHC's  Answers  to

Interrogatories, number #, Ex. 11 to Forsyth Depo.)  If Murphy was pregnant at the

time she was hired, Forsyth had no knowledge of it.  (Id.)

## IV.  Applicable Substantive Law and Analysis

Title VII provides that "[i]t shall be an unlawful employment practice for an

employer . . . to fail or refuse to hire or to discharge any individual, or otherwise

discriminate against any individual with respect to his compensation, terms,

conditions, or privileges of employment, because of such individual's . . . sex . . ."

42 U.S.C. § 2000e-2(a)(1).  The Pregnancy Discrimination Act of 1978 ("PDA"),

42 U.S.C. § 2000e(k), amended Title VII to incorporate into its terms "because of

sex" or "on the basis of sex" to include discrimination "because of or on the basis

of pregnancy, childbirth, or related medical conditions."  Id.  Under the PDA,

"women *affected by pregnancy* . . . shall be treated the same for all employment-

related purposes . . . as other persons *not so affected* but similar in their ability or

14

inability to work." Id. (emphasis added).  By the PDA's own language, Title VII provides protection against pregnancy-related discrimination only when a similarly-situated, non-pregnant employee receives preferential treatment.  See Byrd v. Lakeshore Hosp., 30 F.3d 1380, 1381 (11th Cir. 1994) ("It is today a settled principle that the PDA and Title VII are violated when pregnant employees are denied privileges afforded non-pregnant temporarily disabled employees.").

Discrimination Based on Gender

The Defendant asserts that the Plaintiff cannot establish a prima facie case of pregnancy-related sex discrimination because she has no direct evidence of pregnancy discrimination and she cannot identify a similarly-situated employee outside the protected class who was treated more favorably than her.  The Plaintiff concedes that her case is not based on direct evidence.  Instead Plaintiff Butler bases her case on the circumstantial evidence framework as established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) and Texas Dept. Of Community Affairs v. Burdine, 450 U.S. 248 (1981).[17]

To establish a prima facie case of sex-based discrimination, Plaintiff must

---

[17] In the Eleventh Circuit, the courts have uniformly held that actions brought under the Pregnancy Discrimination Act of 1978 will follow the same analysis employed in other Title VII sex discrimination cases."  Hayes v. Shelby Memorial Hosp., 726 F.2d 1543, 1547 (11th Cir. 1984); See also Maddox v. Grandview Care Ctr., Inc., 780 F.2d 987, 989 (11th Cir. 1986).

show that: (1) she is a member of a protected class; (2) she was qualified for her position; (3) she was subjected to an adverse employment action; and (4)she suffered from a differential application of work or disciplinary rules.  See Spivey v. Beverly Enterprises, Inc., 196 F.3d 1309, 1312 (11th Cir. 1999); Armstrong v. Flowers Hosp. Inc., 33 F.3d 1308, 1314 (11th Cir. 1994).   In other words, the Plaintiff must show that: (1) she was pregnant or capable of becoming pregnant[18]; (2) she was qualified for her position; (3) she was subjected to an adverse employment action; and (4) someone not pregnant or capable of becoming pregnant was treated more favorably.  Morris v. Emory Clinic, Inc., 402 F.3d 1076 (11th Cir. 2003).  It is conceded that Plaintiff Butler was within the protected class; she was pregnant or capable of becoming pregnant.  She was qualified for her position and she was subjected to an adverse employment action when she was terminated.

The Defendant asserts that the Plaintiff cannot satisfy the fourth element by demonstrating that a similarly situated non-pregnant employee (or employee capable of becoming pregnant) was treated more favorably.  Plaintiff Butler has

---

[18] Plaintiff Butler was not aware at the time she was terminated that she was already pregnant.  Plaintiff Butler's expressed intention to become pregnant would bring her under the protection of the Pregnancy Discrimination Act, codified at 42 U.S.C. § 2000e(k) in Title VII. Int'l Union, UAW v. Johnson Controls, Inc., 499 U.S. 187, 205, 111 S.Ct. 1196, 1206 (1991).

identified Stacey Cossey as a comparator. (Complaint ¶¶ 19-21).  The Defendant asserts that Cossey is not similarly situated to Plaintiff Butler because Cossey was a Nursing Assistant, who did not supervise anyone.  (Pl. Depo. pp. 131-3).  In contrast, Plaintiff supervised four to five attendants (including Cossey) on two shifts and had different job duties than Cossey.  (Pl. Depo. pp. 134-135).  Overall, the Defendant asserts that two employees that have different job titles are not similarly situated.  The Plaintiff asserts that Cossey is a proper comparator because they both violated the same standard even though they were at different levels in the organization, but they were  treated differently due to discrimination.

The handbook prohibits insubordination, harassment of patients, visitors and/or fellow partners and the causing of a hostile work environment.  (Partner Handbook, pp. 62-63; see also pp. 68-69).  A plaintiff can satisfy the prima facie case standard if:

> The plaintiff [shows] that [she] and the employees are similarly situated in all relevant respects ... [cites omitted].  In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways.

Jones v. Bessemer Carraway Medical Center, 137 F.3d 1306, 1311 (11th Cir. 1998) (citing Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997).  The Plaintiff relies

on the holding of <u>Lathem v. Dept. of Children and Youth Services</u>, 172 F.3 786,

793 (11th Cir. 1999)(citing <u>Nix v. WLCY Radio/Rahall Communications</u>, 738 F.2d

1181, 1186 (11th Cir. 1984) that:

> If two employees are "similarly situated," the different application of
> workplace rules does not constitute illegal discrimination.   The
> relevant inquiry is not whether the employees held the same job titles,
> but whether the employer subjected them to different employment
> policies.   When an individual proves that [s]he was fired but one
> outside the protected class was retained although both violated the
> same work rule, this raises an inference that the rule was
> discriminatorily applied.

There is no evidence that the policy applied to Plaintiff Butler, a Nurse Supervisor,

and not Cossey, a Nursing Assistant.  However, Plaintiff Butler and Cossey were

involved in similar conduct.  Plaintiff Butler was accused and terminated for failing

to maintain a harmonious relationship and creating a hostile work environment

with both her peers and subordinates.  The Defendant alleges that Forsyth received

several complaints that Plaintiff Butler's subordinates could not work with her and

they threatened to quit.   Similarly, three days before Plaintiff Butler was

terminated, Butler acted as a witness in a reprimand given to Cossey.  (Butler

Depo. pp. 132-134; Forsyth Depo. pp. 184-185; Ex. 4 to Forsyth Depo. p. 7).  In

this meeting, Forsyth told Cossey that she was creating a hostile work environment,

that the other nursing assistants were complaining about her, that none of them

wanted to work with her, and that Cross threatened to quit because of Cossey.  (Id.)
Cossey was not terminated; she was given a verbal reprimand.  (Butler Depo. pp.
132-134).  The Court finds that the Plaintiff has demonstrated that she and Cossey
were in fact similarly situated in that the same policy applied to them and that they
both were alleged to have engaged in the same conduct, but they were treated
differently.

Even though Plaintiff Butler has established a prima facie case of pregnancy
discrimination, the Defendant has offered legitimate, nondiscriminatory, and non-
retaliatory reasons for its employment decision.  The Defendant proffers that
Plaintiff Butler was terminated because she failed to supervise appropriately,
created a hostile work environment that resulted in multiple partners submitting
resignations rather than work with her, and Plaintiff Butler was insubordinate to
Forsyth, her supervisor, by displaying a negative attitude towards Forsyth.

Once the Defendant has proffered legitimate, non-discriminatory reasons for
its employment decision, Plaintiff Butler must demonstrate that the Defendant's
proffered reasons are pretextual in order to avoid summary judgment.  See Amos
v. Tyson Foods, Inc., 153 Fed. Appx. 637, 646 (11th Cir. 2005).  Plaintiff Butler can
establish pretext "either directly by persuading the court that a discriminatory
reason more likely motivated the employer or indirectly by showing that the

employer's proffered explanation is unworthy of credence." <u>Jackson v. State of Alabama State Tenure Comm'n</u>, 405 F.3d 1276, 1289 (11th Cir. 2005). The Defendant asserts that it received complaints about Plaintiff Butler from employees Patty Vera, Judy Cross, Kim Helms, and Jamie Bolton about their work relations with Plaintiff Butler and that they were going to quit because they could not work with her. The complaints of the other partners were used in the Defendant's decision to terminate the Plaintiff. Plaintiff Butler has presented evidence that disputes the Defendant's claims that other partners, including Cross and Bolton wanted to quit their jobs because they could not work with her. Cross told Forsyth that she was having several different problems working at NHC Place, including Plaintiff Butler often being short and grouchy with her, and that things needed to change or she would have to quit. (Cross Declaration, ¶4). However, Cross had issues other than Plaintiff Butler, and she did not tell Forsyth that she would have to quit because of Plaintiff Butler. (<u>Id</u>). Bolton testified that she did not call Forsyth a day or so before Plaintiff Butler was terminated. Instead, Forsyth came to her and told her that "corporate" had received complaints about Plaintiff Butler and that she was investigating them. (Bolton Declaration, ¶3). Forsyth asked Bolton questions about Plaintiff Butler. (<u>Id</u>.) Bolton told Forsyth that Plaintiff Butler was a tough supervisor but that she had to be that way to get her job done.

(Id.)  She also told Forsyth that Plaintiff Butler was the only supervisor who would

pitch in and help the Certified Nursing Assistants and the residents.  (Id.)  Plaintiff

Butler presented evidence that Bolton never told Forsyth, or anyone else, that she

wanted to quit because of Plaintiff Butler, that Plaintiff Butler was hostile or

abusive, or that Plaintiff Butler made her feel like a slave.  (Bolton Declaration,

¶4).  Further, Plaintiff presented evidence that Helms did not say that she was

afraid of Plaintiff Butler, she wanted to quit because of Plaintiff Butler, and she had

created a monster.  (Helms Declaration, ¶¶4-6).  Plaintiff Butler also presented

evidence that Forsyth did not put anything on the termination form about Butler's

alleged disrespectful or insubordinate behavior towards her.  The Court finds that

Plaintiff Butler has presented sufficient evidence to raise a genuine issue of

material fact for a reasonable fact finder to conclude that the Defendant's proffered

legitimate, nondiscriminatory, and non-retaliatory reasons for its employment

decision are pretextual.  Accordingly the Defendant's motion for summary

judgment is due to be denied as to Plaintiff's gender discrimination claim based on

the disparate application of disciplinary work rules.

**Discriminatory Discharge**

Plaintiff Butler alleges in her response to Defendant's motion for summary

judgment that she was subjected to a discriminatory discharge.  The Defendant did

not file a reply brief in response to the Plaintiff's opposition brief.  However, the Defendant may object to the Plaintiff's allegation of a discriminatory discharge claim on the grounds that, although there was reference to the disparate application of disciplinary rules prima facie case in Plaintiff Butler's complaint, there was no reference to a discriminatory discharge prima facie case.

The Plaintiff relies on the United States Supreme Court's ruling in Swierkiewicz v. Soreman N.A, 534 U.S. 506, 122 S.Ct. 992 (2002) that an employment discrimination plaintiff need not plead a prima facie case of discrimination under the McDonnell Douglas framework.  Instead, complaints in employment discrimination actions need only satisfy the simple notice pleading requirements of Federal Rules of Civil Procedure 8(a) and are not subject to a heightened pleading standard.  Swierkiewicz, 534 U.S. at 513, 122 S.Ct. at 998. Plaintiff argues that she therefore only needs to give the Defendant fair notice of the basis for her claims.

"The scope of a judicial complaint under Title VII is limited to the acts of discrimination contained in the EEOC charge or claims 'like or related' to the claims raised in the charge." Coon v. Georgia Pacific Corp., 829 F.2d 1563, 1569 (11th Cir. 1987); See also Sanchez v. Standard Brands, Inc., 431 F.2d 455, 466 (5th Cir. 1970).  Upon review of the Plaintiff's Complaint and EEOC charge, the

Plaintiff alleged that the employer terminated her because of her gender, specifically her statements that she planned to become pregnant.  The Court finds that the Plaintiff alleged sufficient facts to place the Defendant on notice that she was alleging a discriminatory discharge claim.  Therefore, Plaintiff Butler's gender discrimination claim alleged in her complaint was also based on discriminatory discharge.

In order to make out a prima facie case of discriminatory discharge, Plaintiff Butler must prove that: (1) she is a member of a protected class; (2) she was qualified for her job; (3) she was discharged; and (4) her former position was filled by a person outside her protected class.  Ross v. Rhodes Furniture, Inc., 146 F.3d 1286, 1290 (11th Cir. 1998).  It is conceded that Plaintiff Butler was within the protected class; she was pregnant or capable of becoming pregnant.  She was qualified for her position and she was terminated.  Plaintiff was replaced with Iris Murphy.  (NHC's Answers to Interrogatories, number #, Ex. 11 to Forsyth Depo.)  At the time the Defendant hired Murphy, the Defendant had no knowledge whether she was pregnant. (Id.)  The Plaintiff has not presented sufficient evidence that her former position was filled by a person outside her protected class.

Even assuming that Plaintiff satisfies a prima facie case of discriminatory discharge and the Defendant proffers legitimate non-discriminatory reasons for its

employment decision, the Plaintiff hasn't provided sufficient evidence that the

Defendant's reasons would be pretextual because, at the time Murphy was hired,

the Defendant had no knowledge whether she was pregnant.

Accordingly, the Defendant's motion for summary judgment is due to be

granted as to Plaintiff's gender discrimination claim based on discriminatory

discharge.[19]

**Retaliation**

The Plaintiff also asserts that her gender discrimination claim encompasses

an allegation of retaliation.  The Plaintiff asserts that the Defendant  retaliated

against her by terminating her employment after she expressed her intentions to

become pregnant.  In order to establish a prima facie case of retaliation, a Plaintiff

must show that: (1) that [she] engaged in protected activity; (2) that [her] employer

was aware of that activity; (3) that  [she] suffered an adverse employment action;

and (4) that there was a causal link between [her] protected activity and the adverse

employment action.  Maniccia v. Brown, 171 F.3d 1364, 1369 (11th Cir. 1999)

(citing Little v. United Techs., 103 F.3d 956, 959 (11th Cir. 1997)).  The Court

---

[19] Since Defendant moves for summary judgment on Plaintiff's claim that she was terminated because of her intent to become pregnant, the Court finds that Plaintiff's discriminatory discharge variation of her gender discrimination prima facie case is covered by the Defendant's motion for summary judgment.

finds that Plaintiff Butler cannot satisfy the first element of the prima facie case, that she engaged in protected activity.  Accordingly, the Defendant's motion for summary judgment is due to be granted as to Plaintiff's gender discrimination claim based on retaliation.[20]

## V.  Conclusion

For the reasons set forth above, the Defendant's motion for summary judgment is due to be **Denied** in part and **Granted** in part as to Plaintiff's claims.

**DONE** and **ORDERED** this 9th day of June, 2006.


**VIRGINIA EMERSON HOPKINS**
**United States District Judge**

---

[20] Since Defendant moves for summary judgment on Plaintiff's claim that she was terminated because of her intent to become pregnant, the Court finds that Plaintiff's retaliation variation of her gender discrimination prima facie case is covered by the Defendant's motion for summary judgment.